**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**ELKINS**

**RICHARD EUGENE SPIKER,**

Plaintiff,

**v.**

**CIVIL ACTION NO.: 2:16-CV-68**
**(BAILEY)**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

Defendant.

## REPORT AND RECOMMENDATION

## I.  INTRODUCTION

On August 22, 2016, Plaintiff Richard Eugene Spiker ("Plaintiff"), through counsel

Mary Beth Angotti, Esq., filed a Complaint in this Court to obtain judicial review of the

final decision of Defendant Carolyn W. Colvin,[1] Commissioner of Social Security

("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act,

as amended, 42 U.S.C. § 405(g) (2015). (Compl., ECF No. 1). On October 26, 2016,

the Commissioner, through counsel Helen Campbell Altmeyer, Assistant United States

Attorney, filed an Answer and the Administrative Record of the proceedings. (Answer,

ECF No. 7; Admin. R., ECF No. 8). On November 22, 2016, Plaintiff filed a Statement of

Errors and supporting brief.[2] (Pl.'s Statement of Errors ("Pl.'s Br."), ECF No. 11). In turn,

---

[1] The undersigned notes that, on January 23, 2017, Nancy A. Berryhill became the
Acting Commissioner of Social Security.
[2] The undersigned notes that Plaintiff's brief fails to comply with the fifteen-page limit set
forth in LR Civ P 9.02(e). Nevertheless, because the Court subsequently authorized the
Commissioner to file a brief in excess of fifteen pages, the undersigned will consider the entirety
of Plaintiff's brief and excuse the non-compliance with this Court's Local Rules in the interest of
fairness.

on December 21, 2016, the Commissioner filed a Motion for Summary Judgment and supporting brief.[3] (Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 12-2). The matter is now before the undersigned United States Magistrate Judge for a Report and Recommendation to the District Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR Civ P 9.02(a). For the reasons set forth below, the undersigned finds that substantial evidence supports the Commissioner's decision and recommends that the Commissioner's decision be affirmed.

## II.  <u>PROCEDURAL HISTORY</u>

On May 13, 2012, Plaintiff protectively filed a Title II claim for disability and disability insurance benefits ("DIB") and a Title XVI claim for supplemental security income ("SSI") benefits. (R. 22, 105, 414). In both applications, Plaintiff alleges disability that began on March 12, 2012. (R. 22). Plaintiff's claims were initially denied on December 17, 2012, and denied again upon reconsideration on July 12, 2013. (R. 60, 68). After these denials, Plaintiff filed a written request for a hearing. (R. 22).

On January 20, 2015, a hearing was held before United States Administrative Law Judge ("ALJ") Terrence Hugar in Morgantown, West Virginia. (R. 22, 32, 448). Plaintiff, represented by Ms. Angotti, appeared and testified, as did Larry Ostrowski, Ph.D., an impartial vocational expert, and Sandra Spiker, Plaintiff's wife. (R. 22, 448). On February 12, 2015, the ALJ issued an unfavorable decision to Plaintiff, finding that he was not disabled within the meaning of the Social Security Act. (R. 19). On June 28,

---

[3] That same day, the Commissioner filed a Motion [ECF No. 12] for leave to file a supporting brief in excess of fifteen pages. On December 22, 2016, the Court entered an Order [ECF No. 13] granting the Motion and authorizing the Commissioner to file a supporting brief up to twenty-three pages, with which the Commissioner has complied.

2016, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (R. 6).

### III. BACKGROUND

**A. Personal History**

Plaintiff was born on August 15, 1964, and was forty-seven years old at the time he filed his claims for DIB and SSI benefits. (See R. 37). He is 5'10" tall and weighs approximately 245 pounds. (R. 131). He lives in a mobile home with his wife and his twenty-one-year-old son. (R. 152, 454). He obtained a GED in 1988 but has never received any specialized, trade or vocational training. (R. 132). His prior work experience includes working as an ambulance driver, sales attendant, security guard, industrial cleaner and light truck driver. (R. 474-75). He alleges that he is unable to work due to the following ailments: (1) a back injury; (2) three "bulging disks with severe arthritis" and (3) high blood pressure.[4] (R. 131).

**B. Medical History**

**1. Medical History Post-Dating Alleged Onset Date of March 12, 2012[5]**

On March 13, 2012, Plaintiff presented to the office of Cheryl L. Stockett, M.D., his primary care provider, complaining of lower back pain. (R. 230). After an examination, Dr. Stockett noted that Plaintiff was obese, was a smoker and had a blood pressure of 140/92 mm Hg. (R. 340-41). Therefore, Dr. Stockett diagnosed Plaintiff with lumbalgia and muscle spasms, obesity, nicotine dependence and an elevated blood

---

[4] On October 15, 2014, Plaintiff submitted a form entitled "Claimant's Recent Medical Treatment." (R. 185). On this form, Plaintiff states that, in addition to his back impairment and hypertension, he also suffers from sleep apnea, "trigger finger" in his right hand and left leg swelling of unknown etiology. (Id.).
[5] Plaintiff did not submit any medical records pre-dating the alleged onset date of March 12, 2012.

3

pressure reading. (R. 340). Dr. Stockett prescribed Motrin and Lortab for the pain and Flexeril for the muscle spasms. (R. 341). Dr. Stockett also ordered Plaintiff to apply heat to his back as needed and to perform stretches to help with the pain. (Id.).

On March 19, 2012, Plaintiff returned to Dr. Stockett's office, complaining of lower back "pain radiating [down his] right side to halfway down [his] buttocks." (R. 226). Plaintiff informed Dr. Stockett that he had undergone radiofrequency ablation in his lower back ten years ago but that he was once again suffering from back pain.[6] (R. 343). Dr. Stockett performed an examination and noted that, because there was no sign of a disk problem, the pain was likely musculoskeletal. (R. 228). Dr. Stockett added lumbar radiculopathy to Plaintiff's list of diagnoses. (R. 344). Subsequently, Dr. Stockett ordered that Plaintiff undergo physical therapy, which he started on March 27, 2012.[7] (R. 327).

Plaintiff presented to Dr. Stockett's office twice in April of 2012. (R. 217-20, 222-25). On April 2, 2012, Plaintiff stated that physical therapy had "helped [the] pain going down [his] leg" and that he was "[t]rying not to take" Lortab for the pain. (R. 222). During this visit, Dr. Stockett educated Plaintiff on the importance of diet and exercise. (R. 225). On April 17, 2012, Dr. Stockett noted that Plaintiff's blood pressure was 162/98 mm Hg and instructed Plaintiff to monitor his blood pressure at home. (R. 218, 220). Dr. Stockett also noted that Plaintiff had started taking lisinopril for his blood pressure. (R. 220). Because Plaintiff complained of worsening back pain during this visit, Dr. Stockett

---

[6] Plaintiff later stated that he his back pain had "d[one] pretty well for about 10 years" following the radiofrequency ablation but that, in March of 2012, he "hurt himself while he was . . . cleaning up his yard." (R. 236).

[7] Plaintiff was ordered to participate in physical therapy once a week. (R. 222). While Plaintiff appears to have initially participated as ordered, he was discharged from physical therapy on June 14, 2012, due to "lack of attendance." (R. 240-42, 244-46, 327-29, 331-35).

ordered an MRI of his lumbar spine, which was taken on April 22, 2012. (See R. 214, 217). The results of the MRI showed:

(1)     Loss of T2 signal intensity at the L4-5 and L5-S1 intervertebral disc.

(2)     Diffuse disc bulge at L4-L5 with a left subarticular component mildly narrowing the left neural foramina.

(3)     Diffuse disc bulge at L5-S1 mildly effacing the ventral thecal sac.

(R. 214). These results were subsequently interpreted to reveal "some degenerative changes" and "pretty significant lumbosacral articular facet disease of the lower lumbar spine." (R. 235, 237).

On May 4, 2012, Plaintiff presented to the office of Russell Biundo, M.D. (R. 236-38). During this visit, Dr. Biundo documented that Plaintiff had been "referred here for further evaluation" of his lower back pain. (R. 236). Dr. Biundo ordered an X-ray of Plaintiff's lumbar spine, which revealed no acute abnormalities. (R. 238). After an examination, Dr. Biundo diagnosed Plaintiff with "features consistent with articular facet disease." (R. 237). Dr. Biundo recommended Voltaren and a Lidoderm patch for Plaintiff's pain and certain exercises, such as abdominal strengthening and posterior pelvic tilts. (Id.).

On May 11, 2012, Plaintiff returned to Dr. Biundo's office for a follow-up appointment. (R. 235). During this appointment, Dr. Biundo noted that Plaintiff's gait, balance and coordination were normal and that the range of motion of his lumbosacral spine was "excellent." (Id.). Dr. Biundo again recommended exercises, as well as significant weight loss. (Id.). Dr. Biundo noted that he did not recommend articular facet injections since they "w[ould] not take care of the mechanical problem." (Id.).

On May 21, 2012, Plaintiff presented to Dr. Stockett's office for a follow-up appointment. (R. 354). Dr. Stockett documented that Plaintiff reported that, since his last visit, he had been "seen by Dr. Biundo and told had full blow [osteoarthritis] in [his] back and could not work." (Id.). After an examination, Dr. Stockett noted that Plaintiff's blood pressure was 150/98 mm Hg and that he was complaining of depression and sleep issues. (R. 354-55). Dr. Stockett diagnosed, *inter alia*, benign hypertension and depression. (R. 356). She prescribed Cymbalta for Plaintiff's depression and increased his prescription of lisinopril for his blood pressure. (Id.). She also continued Plaintiff's Voltaren prescription, noting that he was "refus[ing] narcotic pain medications." (Id.). On June 21, 2012, Plaintiff returned to Dr. Stockett's office for another follow-up appointment, after which his prescription of lisinopril was further increased. (R. 211).

On June 29, 2012, Plaintiff presented to Dr. Biundo's office, stating that his physical therapy had been terminated but that he continued to suffer from pain and discomfort when extending his lower back. (R. 409). Plaintiff further stated that he was unable to tolerate even light exercise due to his lower back pain. (Id.). Dr. Biundo diagnosed Plaintiff with articular facet disease and referred him to a pain clinic for an articular facet injection and/or medial branch block. (Id.).

On August 1, 2012, Plaintiff presented to Dr. Stockett's office, complaining of lower back pain. (R. 201). During this visit, Dr. Stockett noted that:

> [Plaintiff] states still with pain and limits activity. [Plaintiff] cannot sit or stand long periods of time. Pain 4/10 constantly. Is up and down on pain scale depending. Has been trying to walk and stay as acting [as] possible. Takes motrin as needed. Has not been using flexeril . . . at bedtime. [Plaintiff] does not want to be on narcotic pain medications. . . .

> Is seeking disability. Is unable to work because of back pain. . . . Would
> not be a candidate for other work position because of back which limits
> prolonged sitting, standing, lifting, walking, etc. . . .

(R. 201, 203). Dr. Stockett further noted that Plaintiff's insurance had denied his

Cymbalta prescription and that, therefore, she had changed the prescription to Celexa.

(R. 201). After an examination, Dr. Stockett documented that Plaintiff's hypertension

was "controlled." (R. 204). Nevertheless, she once again increased Plaintiff's lisinopril

prescription and instructed him to lose weight and monitor his diet. (R. 203). On

December 6, 2012, Dr. Stockett noted that Plaintiff had been started on a pravastatin

prescription for his cholesterol. (See R. 206).

On March 1, 2013, Plaintiff returned to Dr. Biundo's office a follow-up

appointment. (R. 270). During this appointment, Dr. Biundo noted that, although

"[Plaintiff] was scheduled to go to the Pain Clinic for articular fascia injection[,] . . . this

was never followed through with for some reason." (Id.). Therefore, Dr. Biundo again

recommended that Plaintiff present to the Pain Clinic and additionally recommended a

bone scan. (Id.).

On March 12, 2013, Plaintiff presented to Dr. Stockett's office, complaining of

"worsening mood." (R. 248, 251). Therefore, Dr. Stockett changed Plaintiff's Celexa

prescription to Cymbalta and increased the dose. (R. 251). During this visit, Dr. Stockett

also noted that, although Plaintiff's blood pressure "does well when he takes his

medications," he had not taken his medication that day. (Id.). As a result, Dr. Stockett

instructed Plaintiff to take his prescriptions as ordered and to cease using tobacco,

monitor his diet and exercise. (Id.).

On May 25, 2014, Plaintiff returned to Dr. Stockett's office, stating that his lower back pain had been worsening over the previous three weeks. (R. 275). Plaintiff also complained of trigger finger in his right ring finger. (Id.). After examining Plaintiff, Dr. Stockett noted that Plaintiff's blood pressure was 180/100 mm Hg and that Plaintiff "[was] not . . . taking his blood pressure [medications] at home." (Id.). Dr. Stockett further noted that Plaintiff was "taking too much Motrin." (R. 277). Dr. Stockett instructed Plaintiff to take Tylenol with diclofenac for his pain and to come in the following day for a blood pressure re-check. (Id.). On May 26, 2014, Dr. Stockett documented that Plaintiff's blood pressure was "improved" and that Plaintiff was requesting an injection for his trigger finger. (R. 283). Dr. Stockett administered the injection, which Plaintiff "tolerated . . . well." (Id.).

On May 8, 2014, Plaintiff again presented to Dr. Stockett's office, complaining of "not being able to sleep well." (R. 286). After an examination, Dr. Stockett diagnosed Plaintiff with fatigue, snoring and possible sleep apnea. (R. 287). She recommended that Plaintiff undergo a sleep study. (Id.). On May 27, 2014, Plaintiff presented to Preston Memorial Hospital's sleep clinic for the sleep study. (R. 272). After the sleep study, Plaintiff was diagnosed with morbid obesity, abnormal sleep architecture, nocturnal hypoxemia and obstructive sleep apnea and instructed to use a continuous positive airway pressure ("CPAP") machine when sleeping. (Id.).

On August 25, 2014, Plaintiff presented to the emergency room at Preston Memorial Hospital, stating that he had fallen the previous day and that his right knee was swelling. (R. 267-69). An X-ray of Plaintiff's right knee was ordered, which revealed no acute abnormalities, mild degenerative changes and a suspected knee joint effusion.

(R. 268). Therefore, Plaintiff was diagnosed with right knee effusion/pain. (R. 267). Plaintiff was prescribed Norco for his pain and instructed to wear a knee brace and apply ice compressions to his knee. (Id.). On August 29, 2014, Plaintiff presented to Dr. Stockett's office for a follow-up from his emergency room visit. (R. 292). Dr. Stockett noted that Plaintiff was wearing his knee brace and would participate in physical therapy.[8] (R. 293). Dr. Stockett further noted that Plaintiff "ha[d] not been taking his blood pressure [medications] at home" and added hydrochlorothiazide to his list of prescriptions. (R. 297, 299). Finally, Dr. Stockett noted that Plaintiff's trigger finger was being treated by Jaiyoung Ryu, M.D., an orthopedist. (R. 299).

On September 30, 2014, Plaintiff returned to Dr. Stockett's office for a follow-up appointment. (R. 304). Dr. Stockett noted that Plaintiff had attempted to quit smoking but, upon gaining weight, had started smoking again. (Id.). Dr. Stockett further noted that Plaintiff had completed physical therapy and that, while his pain had improved, he continued to experience "catching and locking" in his right knee upon movement. (Id.). Dr. Stockett ordered an MRI of Plaintiff's right knee, which showed a suspected medial meniscal tear. (R. 308). Subsequently, Dr. Stockett scheduled Plaintiff for a "scope [of the right knee] to see if . . . clean up . . . help[s] [the] pain." (R. 310).

On November 3, 2014, Plaintiff presented to Preston Memorial Hospital's sleep clinic for a follow-up appointment. (R. 273). During this appointment, it was documented that Plaintiff was "do[ing] well on CPAP therapy." (Id.). However, it was further

---

[8] On or about September 5, 2014, Plaintiff began his physical therapy sessions at Preston Memorial Hospital. (R. 261-66). Plaintiff participated in physical therapy until September 29, 2014. (Id.). At the time of his discharge, Plaintiff's chart reflected that "[he was] demonstrating improved [range of motion] of right knee . . . . Functional outcome measures have improved as well although deficits are still present. Special tests performed indicate possible [medial collateral ligament injury]. . . . [He] continues to have clicking/catching in right knee that may require further investigation." (Id.).

documented that Plaintiff was waking up "at 1 to 2 o'clock in the morning and [experiencing] difficulty falling back to sleep after . . . awakening." (Id.). It was noted that there was "no specific etiology for this awakening" but that it could be caused by Plaintiff's history of working "shift work for the majority of his lift." (Id.). Plaintiff was prescribed Ambien and advised to use it only "where he needs a good night of sleep," not on a nightly basis. (Id.).

### 2. Medical Reports/Opinions

#### a. Disability Determination Explanation by Porfirio Pascasio, M.D., December 13, 2012

On December 13, 2012, Porfirio Pascasio, M.D., a state agency medical consultant, prepared the Disability Determination Explanation at the Initial Level (the "Initial Explanation"). (R. 37-46). In the Initial Explanation, Dr. Pascasio concluded that Plaintiff suffers from the following severe impairments: osteoarthrosis and allied disorder and spine disorders. (R. 40). Additionally, Dr. Pascasio concluded that Plaintiff suffers from the following non-severe impairments: essential hypertension and affective disorders. (Id.).

In the Initial Explanation, Dr. Pascasio completed a physical residual functional capacity ("RFC") assessment of Plaintiff. (R. 42-44). During this assessment, Dr. Pascasio found that, while Plaintiff possesses no manipulative, visual or communicative limitations, Plaintiff possesses exertional, postural and environmental limitations. (Id.). Regarding Plaintiff's exertional limitations, Dr. Pascasio found that Plaintiff is able to: (1) occasionally lift and/or carry twenty pounds; (2) frequently lift and/or carry ten pounds; (3) stand and/or walk for approximately six hours in an eight-hour workday; (4) sit for approximately six hours in an eight-hour workday and (5) push and/or pull with no

limitations. (R. 42-43). Regarding Plaintiff's postural limitations, Dr. Pascasio found that Plaintiff may never climb ladders/ropes/scaffolds and may only occasionally climb ramps/stairs, balance, stoop, kneel, crouch and crawl. (R. 43). Finally, regarding Plaintiff's environmental limitations, Dr. Pascasio found that, while Plaintiff need not avoid extreme cold, extreme heat, wetness, humidity, noise, vibrations or "[f]umes, odors, dusts, gases, poor ventilation, etc.," he should avoid concentrated exposure to hazards such as machinery and heights. (R. 43-44). After completing the RFC assessment, Dr. Pascasio determined that Plaintiff is able to perform light-exertional work with the above limitations. (R. 45).

Also in the Initial Explanation, Joseph A. Shaver, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form. (R. 40-41). On this form, Dr. Shaver analyzed the degree of Plaintiff's functional limitations. (Id.). Specifically, Dr. Shaver rated Plaintiff's restriction in his activities of daily living, difficulties in maintaining social functioning and difficulties in maintaining concentration, persistence or pace as "mild." (R. 41). Additionally, Dr. Shaver rated Plaintiff's episodes of decompensation as "none." (Id.). Finally, Dr. Shaver opined that Plaintiff "possesses the mental capacity to engage in gainful work-like activity on a sustained basis." (Id.).

### b. Disability Determination Explanation by Narendra Parikshak, M.D., May 24, 2013

On May 24, 2013, Narendra Parikshak, M.D., a state agency medical consultant, prepared the Disability Determination Explanation at the Reconsideration level (the "Reconsideration Explanation"). (R. 48-58). In the Reconsideration Explanation, Dr. Parikshak largely agreed with all of Dr. Pascasio's conclusions from the Initial Explanation. (See R. 37-58). However, Dr. Parikshak dissented from several of Dr.

Pascasio's conclusions regarding Plaintiff's environmental limitations. (R. 43-44, 55-56). Specifically, Dr. Parikshak opined that Plaintiff should avoid concentrated exposure to extreme cold and vibrations. (R. 55-56).

Also in the Reconsideration Explanation, Ann Logan, Ph.D., a state agency psychologist, reviewed Dr. Shaver's Psychiatric Review Technique form from the Initial Explanation. (See R. 53). Dr. Logan agreed with and affirmed all of Dr. Shaver's conclusions. (See R. 40-41, 53).

### c. Adult Mental Status Examination by John Damm, Ph.D., June 30, 2013

On June 30, 2013, John Damm, Ph.D., a state agency psychologist, performed an Adult Mental Status Examination of Plaintiff. (R. 255-58). The Mental Status Examination revealed largely normal findings. (See R. 257). However, Dr. Damm noted that Plaintiff complained of worsening depression and anxiety symptoms. (R. 256). Therefore, after completing the Mental Status Examination, Dr. Damm diagnosed Plaintiff with depression secondary to chronic pain. (R. 258). He opined that Plaintiff's "prognosis for improvement seems fair with receipt of psychotherapy." (Id.).

### C. Testimonial Evidence

#### 1. Plaintiff's Testimony

During the administrative hearing on January 20, 2015, Plaintiff testified regarding his work history. Plaintiff was most recently employed by Preston Memorial Hospital.[9] (R. 453). However, Plaintiff's employment was terminated after he injured his

---

[9] On October 15, 2014, Plaintiff submitted a form entitled "Claimant's Work Background." (R. 184). On this form, Plaintiff explains that his duties at Preston Memorial Hospital included housekeeping, security and maintenance. (Id.).

back and his physician would not release him back to work. (Id.). Plaintiff temporarily received unemployment benefits after his termination. (R. 464).

Plaintiff testified that he suffers from multiple physical ailments, the most severe of which is his back impairment. (R. 456). Plaintiff initially injured his back in 2002. After the injury, he underwent three radio frequency ablation procedures, in which the nerves in his back were "burn[ed]" so he could not feel any pain. (R. 457). He believes these procedures allowed him to further harm his back without feeling the resulting pain. (Id.). Subsequently, Plaintiff injured his back again while performing yardwork, after which he "couldn't move." (R. 466). Plaintiff now experiences constant pain on the right side of his back that radiates down to his hip. (R. 456). He takes ibuprofen for the pain, although it is no longer effective. (R. 456, 459).

Plaintiff testified regarding the physical limitations that his back impairment causes. Plaintiff is limited to sitting for a half-hour, lifting "a couple of bags" of groceries and driving for short distances. (R. 460-61). If he tries to do yard work, he will be "down for two days." (R. 461). As for housework, he will wash a few dishes at a time but his wife performs all other household tasks. (R. 460, 463). No matter what activity he is performing, he is required to change position frequently. (R. 460). His back impairment also causes mental symptoms/limitations. Plaintiff "[has] no desire" to leave his house. (Id.). He also has issues controlling his temper and is unable to sleep for longer than four to five hours at a time. (R. 462-63).

In addition to his back impairment, Plaintiff testified that he suffers from multiple other impairments. Plaintiff has a hernia in his stomach, hypertension, high cholesterol, depression and possible gout in his left calf. (R. 458, 462). He has respiratory problems

and has been using a continuous positive airway pressure ("CPAP") machine at night to keep his airway open while asleep since September of 2014. (R. 459). He has "trigger finger" of his right hand, which causes his hand to stiffen. (R. 461). In the morning, Plaintiff is unable to use his right hand for "maybe two hours" until it loosens and becomes functional. (R. 466). Plaintiff also injured his right knee when he slipped in a grocery store in the past, although the knee was "fixed" and is "100 percent new knee now." (R. 459-60, 465).

Finally, Plaintiff testified regarding his routine activities. Every day, Plaintiff awakens, drinks coffee, sits in a recliner and watches the news. (R. 455). He then lets his pet dogs outside and gets something to eat. (Id.). Other than these activities, he "[does not] do hardly anything." (R. 460).

### 2. Sandra Spiker's Testimony

Sandra Spiker, Plaintiff's wife, also testified during the administrative hearing. Ms. Spiker declared that Plaintiff is "not able to do a whole lot." (R. 468). She further declared that she performs all housework and that Plaintiff only washes the dishes "once in awhile." (R. 469-70). Ms. Spiker explained that, although she is disabled and receives disability benefits, she is able to perform the housework because she has "learned to live with [her disability]." (Id.). Ms. Spiker also reported that Plaintiff had experienced two "blackout spells" in the past month-and-a-half. (R. 472). She stated that the blackout spells were "something new" and that she and Plaintiff "[are] not sure what's causing [them]." (Id.).

Ms. Spiker also testified regarding Plaintiff's mental symptoms/limitations. She stated that Plaintiff is "very depressed" and spends a lot of time sleeping. (R. 468). She

also stated that Plaintiff experiences difficulties with concentration and memory and "has no desire to leave the house." (R. 470-71). She described their relationship as "distant" since his alleged date of onset and declared that he has informed her that he has wanted to hurt himself. (R. 471-72).

**D. Vocational Evidence**

**1. Vocational Testimony**

Larry Ostrowski, an impartial vocational expert, also testified during the administrative hearing. (R. 474-82). Initially, Mr. Ostrowski testified regarding the characteristics of Plaintiff's past relevant work. (R. 474-75). Mr. Ostrowski characterized Plaintiff's previous job as an ambulance driver as a very heavy-exertional, semi-skilled position and his job as a sales attendant as a light-exertional, unskilled position. (Id.). Mr. Ostrowski further characterized Plaintiff's jobs as a security guard, industrial cleaner and light truck driver as light and semi-skilled, medium and unskilled and medium and semi-skilled, respectively. (Id.).

After Mr. Ostrowski described Plaintiff's past relevant work, the ALJ presented several hypothetical questions for Mr. Ostrowski's consideration. In the first hypothetical question, the ALJ asked:

> [A]ssume a hypothetical individual with the past jobs you just described. Further assume the individual is limited to work at the light exertional level except the work is with occasional postural, except no crawling or climbing of ladders, ropes or scaffolds. No exposure to hazards such as unprotected heights and moving mechanical parts. Also no concentrated exposure to extreme heat, extreme cold, wetness, humidity and vibration. Also no concentrated exposure to fumes, odors, dust, gases and poor ventilation. Limited to frequent handling and fingering right upper extremity. Must be limited to simple, routine and repetitive tasks. Must entail nor more than occasional interaction with supervisors, co-workers and the public.

Can the hypothetical individual perform any of the past jobs you described?

(R. 475-76). Mr. Ostrowski answered in the negative but opined that the individual could work as a mail clerk for a business, office helper or marker. (R. 476). Next, the ALJ asked if such an individual could perform any work if he were limited to sedentary-exertional work instead of light-exertional work. (R. 477). Mr. Ostrowski answered that such an individual could work as a surveillance system monitor, document preparer or ampoule sealer. (Id.). The ALJ then asked Mr. Ostrowski questions regarding how much time employers generally allow employees to be unproductive. (R. 477-78). In response to these questions, Mr. Ostrowski testified that employers generally allow an employee: (1) to be absent, late for work, or leave early from work two times per month; (2) to take a break for fifteen minutes in the morning, fifteen minutes in the afternoon and thirty minutes for lunch and (3) to be off task for up to ten percent of the workday. (Id.). After the ALJ's questions, Mr. Ostrowski declared that his testimony was consistent with the Dictionary of Occupational Titles ("DOT"). (R. 478).

Plaintiff's counsel, Ms. Angotti, also presented questions for Mr. Ostrowski's consideration during the administrative hearing. (R. 478-82). First, Ms. Angotti presented the following hypothetical to Mr. Ostrowski:

[I]f you take the first hypothetical and you add that an individual that has . . . [m]inimal concentration problems [for five percent of the workday], problems understanding instructions or being forgetful of instructions. And minimal manipulative limitations specifically problems with the right hand for an individual who is right handed[.]

(See R. 478-79). Mr. Ostrowski responded that, "if [the] individual were off task five percent of a workday, the individual generally could still perform the jobs [I previously discussed] at the required levels of productivity." (R. 479). Second, Ms. Angotti asked:

16

> [F]or an individual who's unable to finger five percent of the workday with the right upper extremity, would that individual still be able to perform the occupations you listed at hypothetical[s] one and two?

(See R. 480-82). Mr. Ostrowski responded in the affirmative. (R. 482).

### 2. Disability Reports, Work History Reports & Report of Contact Forms

On an undated Disability Report, Plaintiff declared that he suffers from multiple impairments that limit his ability to work. (R. 130-39). Specifically, Plaintiff declared that the following impairments limit his ability to work: (1) three bulging disks with severe arthritis; (2) high blood pressure and (3) a back injury. (R. 131). Plaintiff stated that he stopped working on March 10, 2012, "[b]ecause of [his] condition(s)." (Id.). After stating that he has received treatment for physical but not mental conditions from health care professionals, he listed Flexeril, hydrocodone, ibuprofen, Lidoderm patches lisinopril and Voltaren as his prescribed medications. (R. 133-34).

On an undated, sparsely completed Work History Report submitted by Plaintiff, Plaintiff indicated that he has worked approximately six job positions in the fifteen years before he became unable to work. (R. 140-51). Specifically, Plaintiff indicated that he has worked as an ambulance driver, truck driver, associate for a large retail chain, builder for a construction company, manager for Family Dollar Stores, Inc., and, most recently, housekeeper/maintenance worker/security guard for a hospital. (R. 140). When describing his most recent position, Plaintiff stated that he worked eight-hour shifts five days a week. (R. 144).

On August 13, 2013, E. Lake, of the Disability Determination Section ("DDS") office in Morgantown, West Virginia, completed a Report of Contact form. (R. 182). On this form, E. Lake reported that neither Plaintiff nor his attorney had supplied a Disability

Report-Appeal form despite filing a written request for a hearing after his request for reconsideration was denied. (Id.). Therefore, E. Lake declared that he was "transferring th[e] case" without the form. (Id.). Subsequently, Plaintiff filed an undated Disability Report-Appeal form, on which he reported that, since his last Disability Report, he had received additional medical care from the Mountaineer Family Care Center for "all [of his] medical conditions." (R. 167-71).

**E.    Lifestyle Evidence**

**1.  First Adult Function Report, May 26, 2012**

On May 26, 2012, Plaintiff, with the help of his wife, Sandra Spiker, submitted his first Adult Function Report. (R. 152-59). In this report, Plaintiff declares that he is unable to work because:

> App[roximately] 9 years ago I injur[ed] my back while on the job. The injury resulted in me having Radio Frequency Oblation to burn the nerves in my back. Then I couldn't feel any pain. The [physician] I am seeing now stated this has caused me not to know I was having more problems the past 9 years. He also told me this was a quick fix for worker's comp and now my injury is worse w[ith] severe arthritis and nothing can be done for my conditions. I will have to live in constant pain the rest of my life.

(R. 159).

Plaintiff describes how his impairments impact his ability to perform some activities but not others. For some activities, Plaintiff requires minimal or no assistance. For example, Plaintiff is able to perform his own personal care, although he requires assistance putting on his shoes and socks. (R. 153). He is able to care for his wife, son and pets, although his wife assists with pet care. (Id.). He is able to wash dishes and occasionally prepare meals. (R. 154). He is able to operate a motor vehicle independently for short distances and shop in stores for groceries. (R. 155). He is able

to pay bills, count change, handle a savings account and use a checkbook/money orders. (Id.). He is able to spend time with others and has visitors over to his home once or twice per week. (R. 156). He is able to get along with authority figures. (R. 158). He is able to follow written instructions and handle changes to his routine. (R. 157-58).

While Plaintiff is able to perform some activities, he describes how others prove more difficult due to his impairments. Plaintiff's impairments affect his abilities to, *inter alia*: lift, squat, bend, stand, reach, walk, sit, kneel and climb stairs. (R. 157). He is limited to lifting fifteen pounds. (Id.). He is also limited to walking a distance of one hundred feet before requiring a two-to-five-minute rest. (Id.). In addition to physical limitations, Plaintiff's pain interferes with his mental abilities, including his abilities to recall information, complete tasks, concentrate and sleep through the night. (R. 153, 157). His pain also causes him to feel "mis[e]rable [and] angry" and to experience feelings of worthlessness. (R. 157). He does not handle stress well. (R. 158).

Finally, Plaintiff details his daily activities. On a typical day, Plaintiff gets out of bed in the morning and "tr[ies] to stay comfortable as well as [he] can." (R. 153). Plaintiff stays comfortable by watching television and frequently changing positions. (R. 156). At some point during the day, he goes outside.[10] (R. 155).

### 2. Personal Pain Questionnaire, May 26, 2012

On May 26, 2012, Plaintiff, with the help of his wife, completed a Personal Pain Questionnaire. (R. 160-64). In this questionnaire, Plaintiff states that he suffers from pain in his lower back, knees and head. (R. 160-62). Regarding his back pain, Plaintiff

---

[10] On October 15, 2014, Plaintiff submitted a form entitled "Claimant's Medications." (R. 183). On this form, Plaintiff indicates that his daily medications include: (1) pravastatin for high cholesterol; (2) lisinopril for hypertension; (3) diclofenac for pain and inflammation; (4) Cymbalta for depression and (5) ibuprofen for pain. (Id.). In addition to these medications, Plaintiff is prescribed eyeglasses that he uses for reading and watching television. (R. 158).

characterizes the pain as aching, stabbing, burning, cramping, throbbing and continuous in nature. (R. 160). Plaintiff states that "almost all movements" aggravate the pain and that "nothing" relieves it. (Id.). He further states that the pain prevents him from lifting, bending, walking "any distance" and standing for long periods of time. (Id.). To treat the pain, he reports that he takes ibuprofen, Flexeril, hydrocodone and diclofenac, all of which he describes as "[n]ever" effective. (R. 161).

Regarding his bilateral knee pain, Plaintiff characterizes the pain as aching and throbbing and estimates that it occurs one to two days per week. (Id.). He explains that, when the pain does occur, it lasts the entire day. (Id.). He further explains that the pain is "intense" and prevents him from standing. (R. 162). He states that movement, including standing and walking, exacerbates the pain and that resting relieves the pain. (Id.).

Finally, regarding his head pain, Plaintiff states that he experiences headaches that throb and ache. (Id.). He estimates that he experiences a headache one to three times per week. (Id.). He explains that the headaches are caused by his hypertension and that controlling his blood pressure relieves his headaches. (R. 163). (Id.). He further explains that, when he experiences a headache, he "ha[s] to lay down [and] rest or sleep." (Id.).

### 3. Second Adult Function Report, February 18, 2013

On February 18, 2013, Plaintiff, with the help of his wife, submitted his second Adult Function Report. (R. 172-79). In this report, Plaintiff explains that he has become more limited in his abilities since his last Adult Function Report. For example, Plaintiff declares:

> I can't do a lot of anything. Walking sitting, lifting and everyday life occur[rences] are becoming more and more difficult. The pain is virtually unbearable. It is very difficult to get up out of a sitting position or to sit for very long at a time. Everyday normal life activities are very hard to accomplish.

(R. 172). Due to these increased limitations, Plaintiff states that his personal tasks "[t]ake[ ] a lot longer" and that he is no longer able to walk, sit, stand or lay "for any period of time." (R. 173, 175). He further states that he no longer provides care for his family or pets and that he no longer spends time with others. (R. 173, 176). He estimates that he is now limited to walking fifty to seventy-five feet before requiring a five-minute rest and lifting "maybe 5 [pounds]." (R. 177). When updating his daily activities, he declares that he no longer goes outside "very often" and that his day consists of frequently changing positions. (R. 173, 175).

## IV.    THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> [The] individual . . . [must have a] physical or mental impairment or impairments . . . of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. . . . '[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §§ 423(d)(2)(A) & 1382c(a)(3)(B). The Social Security Administration uses the following five-step sequential evaluation process to determine whether a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement [of twelve months] . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, [your RFC] . . . is evaluated "based on all the relevant medical and other evidence in your case record . . . ."]

(iv) At the fourth step, we consider our assessment of your [RFC] and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your [RFC] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520 & 416.920. In steps one through four, the burden is on the claimant to prove that he or she is disabled and that, as a result of the disability, he or she is unable to engage in any gainful employment. Richardson v. Califano, 574 F.2d 802, 804 (4th Cir. 1978). Once the claimant so proves, the burden of proof shifts to the Commissioner at step five to demonstrate that jobs exist in the national economy that the claimant is capable of performing. Hicks v. Gardner, 393 F.2d 299, 301 (4th Cir. 1968). If the claimant is determined to be disabled or not disabled during any of the five steps, the process will not proceed to the next step. 20 C.F.R. §§ 404.1520 & 416.920.

# V.   ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the Social Security Administration's five-step sequential evaluation process, the ALJ found that:

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2.     The claimant has not engaged in substantial gainful activity since March 12, 2012, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.     The claimant has the following severe impairments: degenerative disk disease of the lumbar spine; osteoarth[rosis]; obesity; sleep apnea; and depression secondary to chronic pain (20 CFR 404.1520(c) and 416.920(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.     The claimant has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that the claimant may occasionally climb ramps or stairs but never climb ropes, ladders or scaffolds; may occasionally bend, crouch, balance, stoop and squat, but never crawl; may have no exposure to hazards such as unprotected heights and moving mechanical parts; may have no concentrated exposure to extreme heat, extreme cold, wetness, humidity, vibration, fumes, odors, dusts, gases or poor ventilation; is limited to simple, routine and repetitive tasks; may have no more than occasional interaction with co-workers, supervisors and the general public; and is limited to frequent handling and fingering with the right upper extremity.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.     The claimant was born on August 15, 1964[,] and was 47 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from March 12, 2012, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 24-32).

# VI.    DISCUSSION

## A.    Contentions of the Parties

In his Statement of Errors, Plaintiff contends that the Commissioner's decision contains errors of law and is not supported by substantial evidence. (Pl.'s Br. at 1). Specifically, Plaintiff contends that: (1) the Appeals Council erred in failing to consider new evidence; (2) the ALJ improperly evaluated Plaintiff's complaints of pain; (3) the ALJ improperly assigned "much less weight" to Plaintiff's treating physician's opinion than other physicians' opinions; (4) the ALJ improperly "found that . . . Plaintiff's inability to perform substantial gainful activity was not due to his disability but to either his personal choice or his inability to maintain employment for non-medical reasons;" and (5) the ALJ failed to consider the combined effects of Plaintiff's multiple impairments throughout the sequential evaluation process. (Id.). Plaintiff requests that the Court

reverse the Commissioner's decision and remand the case for the calculation of benefits or, in the alternative, remand the case for further proceedings. (See id. at 17).

Alternatively, Defendant contends in her Motion for Summary Judgment that the Commissioner's decision is supported by substantial evidence. (Def.'s Mot. at 1). To counter Plaintiff's arguments, Defendant contends that: (1) Plaintiff's newly submitted evidence fails to meet the requirements for remand; (2) the ALJ's credibility determination of Plaintiff is supported by substantial evidence; (3) the ALJ's evaluation of the opinion of Plaintiff's treating physician is supported by substantial evidence and (4) the ALJ appropriately considered and accounted for all of Plaintiff's work-related limitations throughout the sequential evaluation process. (Def.'s Br. at 8-19). Defendant requests that the Court affirm the Commissioner's decision. (Def.'s Mot. at 1).

## B.  Scope of Review

In reviewing an administrative finding of no disability, the scope of review is limited to determining whether the ALJ applied the proper legal standards and whether the ALJ's factual findings are supported by substantial evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). A "factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Likewise, a factual finding by the ALJ is not binding if it is not supported by substantial evidence. Richardson v. Perales, 402 U.S. 389, 401 (1971). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Id. (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be

somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). When determining whether substantial evidence exists, a court must "not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ's]." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005).

**C.    Analysis of the Administrative Law Judge's Decision**

**1.  Whether a Sentence-Six Remand is Warranted**

On July 16, 2015, Donald Hoffman, M.D., a neurologist, evaluated Plaintiff and drafted a three-page medical report detailing the evaluation. (Pl.'s Br. at 18-20). In this report, Dr. Hoffman notes that Plaintiff has experienced blackouts on several occasions. (Id. at 20). Dr. Hoffman then documents that these blackouts are "suggestive of complex partial seizures and tonic clonic seizures" and orders Plaintiff to undergo an electroencephalogram ("EEG") and brain imaging. (Id.).

Plaintiff argues that the medical report constitutes new and material evidence requiring remand. (Pl.'s Br. at 4). Plaintiff reasons that, if the ALJ had possessed the medical report prior to his decision, "the odds are that a different decision would have been [reached]." (Id. at 5-6). Defendant argues that the medical report fails to constitute new and material evidence. (Def.'s Br. at 8-9).

If a claimant presents evidence that has not been submitted to the ALJ, then the evidence may be considered only for the limited purpose of determining whether a sentence-six remand should be granted pursuant to Section 405(g) of the Social

Security Act. <u>See</u> 42 U.S.C. § 405(g) (2010). Under Section 405(g):

> A reviewing court may remand a Social Security case to the Secretary on the basis of newly discovered evidence if four prerequisites are met. The evidence must be **relevant** to the determination of disability at the time the application was first filed and not merely [duplicative or] cumulative. It must be **material** to the extent that the Secretary's decision might reasonably have been different had the new evidence been before her. There must be **good cause** for the claimant's failure to submit the evidence when the claim was before the Secretary, and the claimant must present to the remanding court at least a **general showing** of the nature of the new evidence.

<u>Wilkins v. Sec'y, Dep't. of Health & Human Servs.</u>, 953 F.2d 93, 96 (4th Cir. 1991) (emphasis added); <u>Wajler v. Colvin</u>, No. 13CV156, 2014 WL 4681759, at *10 (N.D. W. Va. Sept. 19, 2014). In determining whether to grant a sentence-six remand, a court only considers the new evidence that has come to light and does not "rule in any way as to the correctness of the administrative decision." <u>Melkonyan v. Sullivan</u>, 501 U.S. 89, 98 (1991).

In the present case, the undersigned finds that Plaintiff has failed to prove the four prerequisites for a sentence-six remand. While Plaintiff has presented a general showing of the nature of the new evidence and has good cause for failing to submit the evidence at an earlier time,[11] the medical report is not relevant or material.

The medical report is not relevant for several reasons. First, Plaintiff never alleged blackouts or seizures as a basis for his disability claim. Indeed, neither Plaintiff nor his counsel mentioned blackouts or seizures on any of the disability forms or raised them as issues at the administrative hearing. Plaintiff also does not appear to have sought treatment for blackouts or seizures during the time period ranging from his alleged date of onset to the date of the ALJ's decision. The only mention of blackouts in

---

[11] The medical report was drafted six months after the administrative hearing. Therefore, Plaintiff could not have submitted this evidence to the ALJ.

the record was raised by Plaintiff's wife at the administrative hearing, during which she simply stated that Plaintiff had experienced several blackouts. Second, the medical report is duplicative or cumulative of the testimony of Plaintiff's wife. Like the testimony of Plaintiff's wife, the medical report conveys only that Plaintiff has experienced several blackout episodes without offering any definitive diagnosis or treatment plan. Therefore, the medical report is not relevant to Plaintiff's disability claim.

The medical report is also not material. In his decision, the ALJ noted that Plaintiff's "wife testified that he had suffered 'blackout' spells." (R. 27). Therefore, the ALJ considered Plaintiff's blackout episodes but decided that, despite these episodes, Plaintiff is not disabled. Therefore, no reasonable possibility exists that the ALJ would have altered his decision after considering the medical report and a sentence-six remand is not warranted.[12]

### 2. Whether the ALJ Properly Evaluated Plaintiff's Complaints of Pain

Plaintiff argues that the ALJ failed to properly evaluate his complaints of pain. (Pl.'s Br. at 6). Defendant argues that the ALJ applied the proper standards of law and that his determination that Plaintiff's complaints of pain are not entirely credible is supported by substantial evidence. (Def.'s Br. at 12).

Plaintiff contends that "the ALJ does not address the issue of pain in any way in his written decision." (R. 12). The undersigned disagrees. The ALJ noted Plaintiff's "allegations of disabling pain." (R. 31). Additionally, the ALJ noted that Plaintiff was

---

[12] Plaintiff further contends that the matter should be remanded because, "since the time of the initial hearing, [Plaintiff] has been treating with several specialists, including a neurosurgeon, for [his blackouts]" and that the ALJ should consider all of the new evidence. However, Plaintiff did not submit to the Court any additional medical records except for the medical report at issue. Nevertheless, the undersigned believes that it would be more appropriate to submit all of the new evidence obtained after the date of the ALJ's decision in a new claim and not to remand the instant claim.

prescribed Cymbalta for, *inter alia*, chronic back pain and that Plaintiff's obesity may be contributing to his musculoskeletal pain, to name only a few statements in the record detailing and assessing Plaintiff's pain. (R. 28-29). However, despite numerous references to Plaintiff's pain, the ALJ determined that Plaintiff was not entirely credible regarding his pain. (R. 28). See Part VI.C.4, infra (determining that the ALJ's determination that Plaintiff is not entirely credible regarding his subjective complaints is supported by substantial evidence).

Plaintiff further contends that the ALJ did not consider Plaintiff's pain when determining his RFC. (Pl.'s Br. at 8-9). The ultimate responsibility for determining a claimant's RFC is reserved for the ALJ, as the finder of fact. 20 C.F.R. § 416.946(a) (2011); Farnsworth, 604 F. Supp. 2d at 835. The RFC is what a claimant "can still do despite [his or her] limitations." 20 C.F.R. § 404.1545(a)(1) (2012). More specifically, the RFC is "[a] medical assessment of what an individual can do in a work setting in spite of the functional limitations and environmental restrictions imposed by all of his or her medically determinable impairment(s)." Dunn v. Colvin, 607 F. App'x 264, 272 (4th Cir. 2015). During an RFC assessment, an ALJ must consider both severe and non-severe impairments. Wolfe v. Colvin, No. 3:14-CV-4, 2015 WL 401013, at *6 (N.D. W. Va. Jan. 28, 2015).

In the present case, the undersigned finds that the ALJ properly accounted for Plaintiff's pain in the RFC. Plaintiff does not challenge the RFC determination as a whole but instead argues that the ALJ did not address Plaintiff's pain in the RFC assessment. (Pl.'s Br. at 7-10). However, the ALJ accommodated Plaintiff's pain in the RFC by limiting Plaintiff to light-exertional work with certain postural and exertional

limitations. (R. 29) (reasoning that Plaintiff's obesity, musculoskeletal pain, and any related limitations are "accommodated by the limitation to less than the full range of light work"). Indeed, Plaintiff does not identify any limitations caused by Plaintiff's pain that are not accounted for in the RFC.[13] Therefore, Plaintiff's argument is unpersuasive.

### 3. Whether the ALJ Properly Evaluated the Opinion of Plaintiff's Treating Physician

Plaintiff argues that the ALJ "erred in explicitly giving much less weight" to the opinion of Dr. Stockett, Plaintiff's treating physician. (Pl.'s Br. at 12). Defendant argues that the ALJ properly evaluated the opinion of Dr. Stockett and that the ALJ's decision to accord the opinion little weight is supported by substantial evidence. (Def.'s Br. at 16).

An ALJ must "weigh and evaluate every medical opinion in the record." Monroe v. Comm'r of Soc. Sec., No. 1:14CV48, 2015 WL 4477712, at *7 (N.D. W. Va. July 22, 2015). When weighing and evaluating these opinions, an ALJ often accords "greater weight to the testimony of a treating physician" because the treating physician has necessarily examined the claimant and has a treatment relationship with the claimant. Johnson v. Barnhart, 434 F.3d 650, 654 (4th Cir. 2005). However, this "treating physician rule . . . does not require that the [treating physician's] testimony be given controlling weight." Anderson v. Comm'r, Soc. Sec., 127 F. App'x. 96, 97 (4th Cir. 2005). Therefore, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence," then it should not be accorded controlling weight. Id. Additionally, if a physician's opinion encroaches on an issue reserved to the

---

[13] Plaintiff appears to confuse *limitations* with *symptoms*. Pain is a symptom caused by Plaintiff's impairments. Symptoms like pain may result in limitations such as the inability to walk long distances or lift heavy items. The RFC focuses on limitations, not symptoms. Therefore, the ALJ only needed to address the limitations from which Plaintiff suffers as a result of his pain. The ALJ did not need to state that Plaintiff suffers from pain in the RFC.

Commissioner, including the issue of whether a claimant meets the statutory definition of disability, then the opinion should not be accorded controlling weight. 20 C.F.R. § 404.1527(d)(3).

When evaluating medical opinions that are not entitled to controlling weight, an ALJ must consider the factors detailed in 20 C.F.R. § 404.1527. Id. at § 404.1527(c) These factors include: (1) whether the physician has examined the claimant; (2) the treatment relationship between the physician and the claimant, including the nature and extent of the treatment relationship; (3) the supportability of the physician's opinion; (4) the consistency of the opinion with the record; (5) whether the physician is a specialist and (6) any other factor that tends to support or contradict the opinion. Id. An ALJ, however, need not explicitly "recount the details of th[e] analysis [of these factors] in the written opinion." Fluharty v. Colvin, No. CV 2:14-25655, 2015 WL 5476145, at *12 (S.D. W. Va. Sept. 17, 2015).

While an ALJ need not explicitly recount his or her analysis of the factors listed in 20 C.F.R. § 404.1527, an ALJ must "give 'good reasons' in the [written] decision for the weight ultimately allocated to medical source opinions." Id. (quoting 20 C.F.R. § 404.1527). In this regard, Social Security Ruling 96–2p provides that an ALJ's decision "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996). Once an ALJ has determined "the weight to be assigned to a medical opinion[,] [that determination] generally will not be disturbed absent some indication that the ALJ has dredged up 'specious inconsistencies' or has failed to give a sufficient reason for the weight

afforded a particular opinion." <u>Dunn v. Colvin</u>, 607 F. App'x. 264, 267 (4th Cir. 2015) (internal citations omitted).

In the present case, the ALJ accorded little weight to the opinion of Dr. Stockett contained in her treatment note dated August 1, 2012. (R. 29-30). Initially, the ALJ noted that Dr. Stockett concluded in her treatment note that Plaintiff: (1) is "unable to work because of back pain" and (2) is "not . . . a candidate for other work position because of back [impairment]." (R. 29). The ALJ then declined to accord the opinion controlling weight, nothing that Dr. Stockett's opinion is not supported by the record and "addresses the ultimate issue of disability, [which is] reserved to the commissioner." (R. 30). Subsequently, the ALJ reasoned that the opinion was entitled to only little weight because

> Although the opinion of a treating source deserves careful consideration, th[e] opinion [of Plaintiff's primary care provider, Cheryl Stockett, M.D.] . . . does not significantly support the claimant's assertions. First, Dr. Stockett provided no specific limitations regarding the claimant's functional capacity, but merely set forth a conclusory, vague statement. Additionally, the opinion is not supported by any treatment notes indicating inability to perform certain tasks or exacerbation of pain; nor does the doctor opine as to how long any supposed limitations would be expected to last – making them less valuable in the undersigned's assessment of the claimant's [RFC]. . . .
>
> Notable, at the same visit, the provider noted the claimant had not been taking his prescribed muscle relaxer and refused any narcotic pain medications. The claimant was also discharged from physical therapy in 2012 due to a lack of attendance. The claimant's condition, when treated as prescribed, would not preclude the work adopted in the [RFC]. The undersigned gave little weight to this medical source statement, which addresses the ultimate issue of disability, reserved to the commissioner, and does not specifically address the claimant's [RFC] in any meaningful way.

(R. 29-30) (internal citations omitted).

The undersigned finds that the ALJ properly evaluated Dr. Stockett's opinion.

The ALJ determined that Dr. Stockett's opinion was not entitled to controlling weight because, *inter alia*, it was not supported by the record. The ALJ then proceeded to consider the five factors listed in 20 C.F.R. §§ 404.1527 and 416.927. While the ALJ did not explicitly recount the details of his analysis of the five factors in his written opinion, his consideration of the factors is obvious by his statements that: (1) Dr. Stockett is a treating source[14] (factor one); Dr. Stockett is Plaintiff's primary care physician (factors two and five); Dr. Stockett's opinion "is not supported by any treatment notes indicating inability to perform certain tasks or exacerbation of pain" (factor three) and Dr. Stockett documented on the same date as her opinion that Plaintiff "had not been taking his prescribed muscle relaxer and refused any narcotic pain medications," which is inconsistent with the opinion (factor four). Moreover, the ALJ provided his reasons for according the opinion little weight, which are sufficiently specific. Therefore, the ALJ followed proper procedure when according Dr. Stockett's opinion little weight.

Plaintiff argues that the ALJ "based his decision" to accord Dr. Stockett's opinion little weight "on a non-existent statement from . . . [another] treating physician[ ] that was not in evidence." (Pl.'s Br. at 13). Plaintiff is referring to the following paragraph in the ALJ's decision:

> Despite the claimant's assertions at the hearing [and] . . . to Dr. Stockett in May 2012 that he was 'seen by Dr. Biundo and told he had full blow[n] OA in [his] back and could not work,' . . . no records corroborate this second-hand statement and Dr. Biundo's treatment notes are not consistent with such allegations. Even if this opinion actually was offered by Dr. Biundo, the undersigned would give it little weight due to the inconsistency with his own treatment notes and the objective findings in the record.

---

[14] The Social Security Administration utilizes three classifications of medical sources: treating sources; examining but non-treating sources; and non-examining sources. 20 C.F.R. §§ 404.1527, 416.927; 20 C.F.R. §§ 404.1502, 416.902. Therefore, because the ALJ classified Dr. Stockett as a treating source, he necessarily took note that Dr. Stockett had examined Plaintiff.

(R. 30). The undersigned disagrees with Plaintiff's argument. The paragraph in dispute appears after the ALJ discussed Dr. Stockett's treatment note dated May 21, 2012, and his reasons for according the opinions contained in the treatment note little weight. After discussing Dr. Stockett's opinion, the ALJ identified the other medical opinions of record and his reasons for crediting or discrediting them. Therefore, the paragraph identified by Plaintiff was used by the ALJ to explain that, despite Plaintiff's testimony that "Dr. Biundo . . . told [him that he] . . . could not work," no such statement exists in the record[15] but that, even if it did, the ALJ would be disinclined to credit the statement. Thus, the ALJ was identifying the remaining medical opinions of record and either crediting or discrediting the opinions. The identified paragraph, however, has no relation to the ALJ's assessment of Dr. Stockett's August 1, 2012, treatment notes.[16] Consequently, the ALJ's assignment of little weight to the opinion of Dr. Stockett is supported by substantial evidence.

### 4. Whether the ALJ Properly Determined Plaintiff's Credibility

Plaintiff argues that the ALJ erred when determining Plaintiff's credibility by considering improper factors in his credibility assessment. (Pl.'s Br. at 14-15). Defendant argues that the ALJ properly assessed Plaintiff's credibility and that the ALJ's credibility determination is supported by substantial evidence. (Def.'s Br. at 12-16).

---

[15] Plaintiff acknowledges that Dr. Biundo's statement that Plaintiff could not work "[i]s not in the evidence." (Pl.'s Br. at 13).

[16] To the extent that Plaintiff is arguing that an ALJ cannot explicitly assign "much less weight" to the opinion of a treating physician than to the opinion of a non-treating physician, the undersigned notes that courts have routinely upheld decisions by ALJs to accord more weight to the opinions of non-treating physicians, including state agency physicians, than to the opinions of treating physician. See, e.g., Tanner v. Comm'r of Soc. Sec., 602 F. App'x 95, 101 (4th Cir. 2015) (upholding an ALJ's "decision to accord more weight to the opinions of . . . agency consultants than to the opinions of . . . treating physicians [because they were] . . . supported by the medical evidence as a whole").

"[T]he determination of whether a person is disabled by pain or other symptoms is a two-step process." See Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996); see also 20 C.F.R. § 404.1529(c)(1) (2011); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). First, the ALJ must expressly consider whether the claimant has demonstrated, through objective medical evidence, that a medical impairment exists that is capable of causing the degree and type of pain alleged. See Craig, 76 F.3d at 594. Second, the ALJ must consider the credibility of the claimant's subjective allegations of pain in light of the entire record. Id.

Social Security Ruling 96-7p[17] sets out several factors, in addition to the objective medical evidence, for an ALJ to consider when assessing the credibility of a claimant's subjective symptoms and limitations, including:

1.    The individual's daily activities;

2.    The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3.    Factors that precipitate and aggravate the symptoms;

4.    The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5.    Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6.    Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for [fifteen] to [twenty] minutes every hour, or sleeping on a board), and

7.    Any other factors concerning the individual's functional limitations

---

[17] On March 16, 2016, SSR 96-7p was superseded by SSR 16-3p. Nevertheless, because SSR 16-3p was not issued until after the date of the ALJ's decision, the undersigned will review whether the ALJ's decision comports with SSR 96-7p, the ruling that was applicable on the date of the ALJ's decision.

and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). An ALJ need not document specific findings as to each factor. <u>Wolfe v. Colvin</u>, No. 3:14-CV-4, 2015 WL 401013, at *4 (N.D. W. Va. Jan. 28, 2015). However, the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186 at *2. Because the ALJ has the opportunity to observe the demeanor of the claimant, the ALJ's observations concerning the claimant's credibility are given great weight. <u>Shively</u>, 739 F.2d at 989-90. This Court has determined that "[a]n ALJ's credibility determinations are 'virtually unreviewable' by this Court." <u>Ryan v. Astrue</u>, No. 5:09CV55, 2011 WL 541125, at *3 (N.D. W. Va. Feb. 8, 2011). If the ALJ meets his or her basic duty of explanation, then "an ALJ's credibility determination [will be reversed] only if the claimant can show [that] it was 'patently wrong.'" <u>Sencindiver v. Astrue</u>, No. 3:08-CV-178, 2010 WL 446174, at *33 (N.D. W. Va. Feb. 3, 2010) (quoting <u>Powers v. Apfel</u>, 207 F.3d 431, 435 (7th Cir. 2000)).

In the present case, the undersigned finds that the ALJ properly followed the two-step process when determining that Plaintiff is "not entirely credible." (R. 28). Initially, the ALJ determined that Plaintiff had proved that he suffers from medical impairments that "could reasonably be expected to cause some of the alleged symptoms." (<u>Id.</u>). Then, after examining the factors outlined in SSR 96-7p, the ALJ further determined that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible" in light of the entire record. (<u>Id.</u>).

### i. Plaintiff's Daily Activities

The ALJ considered Plaintiff's daily activities (factor one) when making his credibility determination. (R. 30-31). Specifically, the ALJ noted that Plaintiff's wife "claimed to . . . perform the majority of the household chores," but discredited the statement because she "is also allegedly 'disabled' due to back and heart conditions." (Id.). The ALJ further noted that Plaintiff, although Plaintiff "has alleged difficulty with every exertional and postural activity listed on the Adult Function Report form," he is able to, *inter alia*: walk one hundred feet without resting, carry "a few bags of groceries;" wash dishes and drive up to forty-five minutes. (R. 27).

### ii. Plaintiff's Pain and Other Symptoms

The ALJ also reviewed the location, duration, frequency and intensity of Plaintiff's pain and other symptoms (factor two) and the factors that precipitate and aggravate those symptoms (factor three). Regarding Plaintiff's symptoms, the ALJ noted that Plaintiff complaints include depressive symptoms, irritability, memory and concentration issues, back pain, insomnia and "trigger finger." (R. 28-29). The ALJ also noted that Plaintiff's wife testified that he suffered from "blackout" spells. (R. 27).

Regarding factors that precipitate/aggravate those Plaintiff's symptoms, the ALJ documented that Plaintiff's obesity "may be reasonably anticipated to produce or contribute to symptoms of . . . musculoskeletal pain, and to generally limit mobility and stamina," in addition to exacerbating the degenerative disk disease of his lumbar spine. (R. 28-29).

### iii. Plaintiff's Medications

The ALJ generally discussed the medication that Plaintiff is prescribed for his

symptoms (factor four). For example, the ALJ noted that Plaintiff has taken Cymbalta "for chronic back pain as well as mild mood issues" and Ambien for insomnia (R. 28-29). The ALJ further noted that Plaintiff has been non-compliant with his medication regimen in the past and that he has refused narcotic pain medications. (R. 30).

### iv.    Other Treatment and Measures Used to Relieve Symptoms

Next, the ALJ reviewed treatment other than medication that Plaintiff has received for relief of his symptoms (factor five) as well as measures Plaintiff uses to relieve his symptoms on her own (factor six). Regarding treatment other than medication that Plaintiff has received for his symptoms, the ALJ documented that, while he "has not been referred for [back] surgery," Plaintiff has undergone "fascia injections and nerve blocks" for his back pain, which "improved [his] symptoms remarkably," and that he had been "advised to consider evaluation at a pain clinic for possible further injections. (R. 29). The ALJ also documented that Plaintiff uses a CPAP machine at night for his sleep apnea. (Id.). Finally, the ALJ documented that, despite claims of depression, "[t]here is no evidence of any consideration for psychotherapy or other specialized mental health treatment" in the record. (R. 28).

As for measures Plaintiff uses to relieve his symptoms on his own, the ALJ noted that Plaintiff attempts to limit his activity. (See R. 27).

### v.    Receipt of Unemployment Benefits

Finally, the ALJ considered the fact that, "for at least 2013 through 2014, [Plaintiff] sought and obtained unemployment benefits." (R. 29). The ALJ reasoned that, although "not dispositive," Plaintiff's receipt of unemployment benefits "indicat[e] he was available and able to work." (R. 24, 29). The ALJ also considered the fact that "in 2014

[Plaintiff informed one of his treatment providers that] he had retired." (R. 29). The ALJ concluded that Plaintiff's statement that he had retired and his receipt of unemployment benefits "indicate [Plaintiff's] current unemployment likely does not arise largely from any medical condition, but rather is the result of either [his] personal choice or his inability maintain employment for non-medical reasons." (Id.).

Plaintiff argues that the Commissioner should not consider employability or the receipt of unemployment benefits when assessing credibility.[18] (Pl.'s Br. at 14-15). The undersigned disagrees. Regarding the issue of credibility:

> [A]n application for unemployment benefits is . . . a piece of significant evidence. . . . [T]o apply for unemployment benefits, a claimant must 'certify that he [is] physically and mentally able, willing, and available to work.' Such a certification contradicts [a c]laimant's representation that his symptoms were so intense and persistent, he was unable to perform basic work-related functions. As such, it is a relevant piece of the credibility assessment.

Vanduzer v. Colvin, No. 2:14-CV-17230, 2015 WL 4715974, at *21 (S.D. W. Va. Aug. 7, 2015); Martin v. Colvin, 2015 WL 1346990, at *4 (E.D.N.C. Mar. 24, 2015) ("Although the 'receipt of unemployment compensation does not in itself prove ability to work, . . . numerous courts within this circuit have held that the acceptance of unemployment benefits may weigh against an individual's credibility"); Bird v. Colvin, 2015 WL 1062040, at *9 (D. Md. Mar. 10, 2015) (finding that consideration of unemployment benefits was proper in making a credibility finding). Therefore, the ALJ did not err in considering Plaintiff's receipt

---

[18] Plaintiff points to 20 C.F.R. § 404.1566(c) to support her contention. (Pl.'s Br. at 14). However, 20 C.F.R. § 404.1566(c) provides that the Commissioner "will determine that you are not disabled if your [RFC] and vocational abilities make it possible for you to do work which exists in the national economy, but you remain unemployed because of . . . [y]our inability to get work[, personal preferences, etc.]." 20 C.F.R. § 404.1566(c). Therefore, 20 C.F.R. § 404.1566(c) does not actually support Plaintiff's contention.

of unemployment benefits during his credibility assessment.

### vi. Substantial Evidence Supports the ALJ's Credibility Determination

After a careful review of the ALJ's decision and the evidence of record, the undersigned finds that the ALJ's credibility determination is sufficiently specific to make clear his reasoning in finding Plaintiff not entirely credible. Thus, the burden was on Plaintiff to show that the ALJ's credibility determination is patently wrong. Plaintiff failed to meet this burden. Consequently, the undersigned accords the ALJ's credibility determination the great weight to which it is entitled.

### 5. Whether the ALJ Considered the Combined Effects of Plaintiff's Multiple Impairments Throughout the Sequential Evaluation Process

Plaintiff argues that the ALJ failed to consider the combined effect of Plaintiff's multiple impairments throughout the sequential evaluation process. (Pl.'s Br. at 15). Defendant argues that the ALJ appropriately considered and accounted for all of Plaintiff's limitations. (Def.'s Br. at 19).

Plaintiff first argues that, at step two, the ALJ failed to property evaluate his mental impairments.[19] (Pl.'s Br. at 16). Specifically, Plaintiff argues that "the ALJ failed to follow the required analysis of the four-broad functional areas (activities of daily living, social functioning, a concentration category and episodes of decompensation) and the degree to which [Plaintiff's] impairments interfere[ ] with each broad functional area." (Pl.'s Br. at 16). The undersigned finds that this argument lacks merit. Initially, the

---

[19] Plaintiff contends that "the ALJ did not consider [Plaintiff's] mental impairments when presenting the Vocational Expert with his two hypotheticals." (Pl.'s Br. at 16). The undersigned notes, however, that the ALJ's hypotheticals to the vocational expert included a limitation for "simple, routine and repetitive tasks," as well as "occasional interaction with supervisors, co-workers and the public." (R. 475-76). Plaintiff does not specify any additional limitations caused by his mental impairments that should have been presented in the hypothetical questions.

undersigned notes that the ALJ performed the required analysis of the four functional areas and discussed his analysis of the four areas in step three. (R. 25-27) (stating that Plaintiff suffers from mild restriction in his activities of daily living, moderate difficulties in his social functioning, moderate difficulties in his concentration, persistent and pace and no episodes of decompensation); see also Pearson v. Colvin, No. 2:14-CV-26, 2015 WL 3757122, at *34 (N.D. W. Va. June 16, 2015) (stating that a reviewing court must read and consider an ALJ's "decision as a whole").

Moreover, any error that occurred is harmless in nature. At step two, a claimant bears the burden of proving that he or she suffers from a medically determinable impairment that is severe in nature. Farnsworth v. Astrue, 604 F. Supp. 2d 828, 851 (N.D. W. Va. 2009). In the present case, the ALJ evaluated Plaintiff's depression and determined that it was severe. (R. 24). Plaintiff does not identify an additional mental impairment that the ALJ failed to discuss at step two or failed to label as severe in nature. Therefore, any error committed by the ALJ at step two in evaluating Plaintiff's mental limitations is harmless in nature. See Pierce v. Colvin, No. 5:14CV37, 2015 WL 136651, at *16 (N.D. W. Va. 2015) (stating that an ALJ's failure to find specific impairment severe at step two is harmless error if the ALJ 'continued through the remaining steps [of the evaluation process] and considered all of the claimant's impairments').

Next, Plaintiff argues that the ALJ failed to consider the combined effects of Plaintiff's impairments at step three of the sequential evaluation process. (Pl.'s Br. at 16-17). It is not clear to the undersigned why Plaintiff believes the ALJ failed to consider the combined effects of his impairments at step three, and Plaintiff offers no support for his

bald allegation. At step three, the ALJ documented that Plaintiff "does not have an impairment *or combination of impairments* that meets or medically equals the severity of one of the listed impairments." (R. 25) (emphasis added). In his reasoning, the ALJ explained the specific listings he considered and why Plaintiff does not meet the requirements of the listings.[20] (R. 25-27). The ALJ even considered Plaintiff's obesity, although "[t]here is no listing for obesity," and concluded that, by itself, Plaintiff's obesity did not rise to the severity of a listing and, when considered with Plaintiff's other impairments, did not exacerbate the "other impairments to the point of listing-level severity." (R. 25). Therefore, the undersigned finds that Plaintiff's argument is without merit and that the ALJ did not fail to consider the combined effects of Plaintiff's multiple impairments throughout the sequential evaluation process.

## VII.  RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying Plaintiff's applications for DIB and SSI benefits is supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Statement of Errors (ECF No. 11) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 12-2) be **GRANTED**, the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made and the basis for such objections. A copy of such objections should also be

---

[20] Plaintiff does not argue that the ALJ failed to consider a relevant listing or that the ALJ erred in determining that Plaintiff's impairments fail to meet the severity of the identified listings.

submitted to the Honorable John Preston Bailey, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir. 1984), <u>cert. denied</u>, 467 U.S. 1208 (1984); <u>Wright v. Collins</u>, 766 F.2d 841, 845-48 (4th Cir. 1985); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this 3rd day of May, 2017.

ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE